FILED
2008 Feb-01  AM 09:51
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| CLIVE SAMUELS & ASSOCIATES, INC., | ) | |
| | ) | |
| PLAINTIFF, | ) | **2:06-cv-1701-JHH** |
| VS. | ) | |
| RETAIL GROUP SE, INC., and JEROME D. HOFFMAN, | ) | |
| DEFENDANTS. | ) | |

## MEMORANDUM OF DECISION

The court has before it the October 11, 2007 motion (doc. # 35) of plaintiff Clive Samuels & Associates, Inc. for summary judgment. Pursuant to the court's October 17, 2007 order, the motion was deemed submitted, without oral argument, on November 14, 2007.

## I. Procedural History

Plaintiff Clive Samuels & Associates, Inc. (CSA) commenced this action on August 28, 2006 by filing a complaint in this court alleging breach of contract against defendants Boxcar Foods USA, Inc. (Boxcar), Retail Group SE, Inc. (Retail Group) and Jerome D. Hoffman. In addition, CSA asks the court to

disregard the corporate form of Boxcar and Retail Group and hold Hoffman personally liable for the debts of Boxcar and Retail Group to CSA.   Plaintiff's October 11, 2007 motion for summary judgment asserts that CSA is entitled to judgment as a matter of law.   Defendants contend that summary judgment is inappropriate because material questions of fact exist.

Both parties have filed briefs and submitted evidence in support of their respective positions.  Plaintiff submitted a brief (doc. # 36) and evidence[1] (doc. # 37) in support of its own motion for summary judgment on October 11, 2007.  On November 5, 2007, defendants filed a brief and evidence[2] (doc. # 42) in opposition to plaintiff's motion for summary judgment.  On November 14, 2007, plaintiff filed a brief (doc. # 43) in reply to the defendants' opposition.

_____

[1] The defendant submitted the following evidence: answer to complaint; defendants' responses to plaintiff's second set of discovery; plaintiff's second set of discovery; Clive Samuels affidavit; deposition of Jerome Hoffman; 10/09/05 proposal by CSA for engineering and design services; 10/12/05 letter from Jerome Hoffman to CSA; CSA invoices; defendants' supplemental responses to plaintiff's first and second interrogatories, requests for admissions and requests for production; plaintiff's first interrogatories, requests for admissions and requests for production; recording of an investigative report by local Atlanta television station; Hoffman press release responding to investigative report; deposition of James C. Trolinger; articles of incorporation of Retail Group SE, Inc.; defendants' responses to initial disclosures.

[2] The plaintiff submitted the following evidence: corporate filing of Boxcar Foods, Inc; corporate filing of Boxcar Stores USA, Inc.; affidavit of Jerome Hoffman; affidavit of Aaron Arrandondo; schematic of perishable food center; corporate filing of Retail Group SE, Inc.; e-mail from Tom Wieczlowski to Jerome Hoffman; store lease excerpts from Athens, GA, Roanoke, AL, Tuscaloosa, AL, Cullman, AL, Birmingham, AL, Greensboro, NC, Charlotte, NC, Mebane, NC, Salisbury, NC, Zebulon, NC, Greer, SC, Conway, SC.

After the motion (doc. # 35) for summary judgment came under submission and upon examination of the of the plaintiff's brief (doc. # 36), defendants' brief (doc. # 42), and the evidence submitted by both parties, the court dismissed (doc. #44) defendant Boxcar as a party to this case.  The court dismissed Boxcar because the parties agree that there is no such entity.  Although the court permitted the plaintiff to amend its complaint to add the correct entity, plaintiff notified (doc. #45) the court of its election not to amend the complaint.  Therefore, the court considers the instant motion for summary judgment against the two remaining defendants only.

Contained within defendants' opposition to plaintiff's motion for summary judgment is a motion to strike[3] (see opp. br. at 11-12) plaintiff's exhibit 11, the news footage of an investigative report by a local Atlanta television station regarding alleged fraudulent business practices of Boxcar Stores and Hoffman.  In support of this motion, defendants first note that CSA made no reference to this exhibit in its brief in support of its motion for summary judgment.[4]  Defendants argue that the exhibit is replete with hearsay, and, as such, is inadmissible.  See

---

[3] Although defendants do not title this section of their brief a motion to strike, the court considers it as such.

[4] This statement is incorrect.  In the last paragraph of its statement of facts, CSA notes the investigative report and Hoffman's press release in response to the report.  (Pl. Br. at 6.)  CSA, however, does not refer to the report in its argument in support of summary judgment.

3

Fed.R. Evid. 801; <u>Club Car, Inc. v. Club Bar (Quebec), Inc.</u>, 362 F.3d 775, 783 (11th Cir. 2004). Defendants also contend that the prejudicial effect of the introduction of the newscast far outweighs its probative value, rendering the exhibit inadmissible. <u>See</u> Fed.R.Evid. 403; <u>Broadway v. City of Montgomery, AL</u>, 530 F.2d 657, 661 (5th Cir. 1976). The court agrees with defendants and does not consider this exhibit in ruling on the motion for summary judgment.

## II. Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986); <u>Chapman v. AI Transport</u>, 229 F.3d 1012, 1023 (11th Cir. 2000). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. <u>See</u> <u>id.</u> at 323. Once the moving party has met its burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there

4

is a genuine issue for trial.  See id. at 324.

The substantive law will identify which facts are material and which are irrelevant.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  See id. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial.  See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four Parcels of Real Property, 941 F.2d 1428 (11th Cir. 1991)(en banc)).  If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial.  See Fitzpatrick, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case.  See Fitzpatrick, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict

motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts.  See Lewis v. Casey, 518 U.S. 343, 358 (1996) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

### III. Relevant Undisputed Facts[5]

In late September 2005, Hoffman, the CEO, CFO, and sole stockholder of Retail Group (Hoffman Dep. at 15-16; Def.'s Ex. 6), approached CSA regarding the conversion of existing supermarket stores into multipurpose retail stores. (Ans. ¶ 8.)  The multipurpose store, to be called "Boxcar Foods," would each contain a grocery store, gas station and restaurant.  (Id.; Trolinger Dep. at 7.) Hoffman asked CSA to provide a proposal for engineering design services related to the conversion of the existing supermarkets into Boxcar Food stores.  (Ans. ¶ 9; Trolinger Dep. at 10.)

More specifically, Hoffman asked CSA to design the refrigerated areas of the store.  (Hoffman Dep. at 26; Trolinger Dep. at 10.)  Hoffman wanted CSA to design a refrigeration enclosure that would hold perishable products on palletized carts located behind an air curtain system.  (Def.'s Ex. 6.)   The air curtain system

---

[5] If the facts are in dispute, they are stated in a manner most favorable to the non-movant. See Fitzpatrick, 2 F.3d at 1115.

would replace the doors typically used in refrigeration units.  (Hoffman Dep. at

36-37.)  Hoffman wanted to eliminate the need for customers to open doors to

access products in his stores.  (Id. at 55.)  In addition, Hoffman believed that the

air curtain system would reduce labor costs and integrate the process of handling

products.[6]  (Hoffman Aff. ¶ 5.)

On or about October 9, 2005, CSA submitted a proposal for engineering

and design services.  (Ex. A to Samuels Aff.)  In a letter dated October 12, 2005,

Hoffman accepted CSA's proposal.  (Ex. B to Samuels Aff.)  The letter, written on

Retail Group stationary and signed by Hoffman, stated as follows, in pertinent

part:

> Reference your proposal for Boxcar Foods USA Inc. dated October
> 9th, 2005, we hereby accept.
>
> Retail Group S.E. Inc. and Boxcar Foods USA Inc. hereby guarantee
> payment within ninety (90) days.[7]
>
> As agreed upon, you will deliver the prototype engineering and
> specifications within eight weeks of today.  And we will notify you
> accordingly what will be the first location.

(Id.)

---

[6] Hoffman testified that because of his innovative refrigeration system, he believed that
Boxcar Stores would be able to "sell food 20 percent cheaper than Wal-Mart and make 5 times as
much money."  (Hoffman Dep. at 110-111.)

[7] This time frame was a change from the proposal which required payment within 30
days of receipt of the invoice.  (Pl. Ex. 6.)

Although Hoffman's acceptance letter explicitly accepts the proposal in the name of Boxcar Foods USA, Inc. and guarantees payment using the name Boxcar Foods USA, Inc. (and Retail Group S.E. Inc.), it is undisputed that there is no such entity by the name of Boxcar Foods USA Inc.  Hoffman insists that he made a mistake in the acceptance letter and that "[t]he correct name that should have been in the contract was Boxcar Foods, Inc., which was incorporated in Alabama on or about December 13, 2002."  (Def.'s Ex. 2 at ¶18.)  This alleged mistake was not revealed to CSA at any time during its relationship with Hoffman; instead CSA learned of the alleged mistake during discovery.  (See id.)

When the project began, Hoffman requested an "open" refrigeration system, where the refrigerated areas in the stores did not have doors, but instead used an air curtain system to keep the goods refrigerated.  (Hoffman Dep. at 35-37.)  At some point during the design process, CSA recommended changing the proposed design for the refrigeration system to include doors on certain refrigerated areas.[8] (Samuels Aff. ¶ 9.)  Hoffman approved this change to the proposed design, although he testified that he "was forced to go along with this" because "we were

_____

[8] CSA recommended this change because the air curtain system would be significantly more expensive in terms of utility costs.  (Hoffman Dep. at 107-08; Trolinger Dep. at 12.)

9

so far into it with a number of stores and fighting a deadline."[9]  (Hoffman Dep. at

99, 100, 142; Trolinger Dep. at 13-14, 18-19, 24, 29, 35-36.)  CSA ultimately

provided Hoffman with six sets of drawings[10] where CSA did the engineering

work for six different stores.  (Hoffman Dep. at 161.)

Beginning in January of 2006 and ending in July of 2006, CSA submitted

28 invoices to Hoffman, totaling $549,203.20.  (Pl.'s Ex. 8; Samuels Aff. ¶ 12.)

Neither Retail Group nor Hoffman paid a single invoice submitted by CSA for its

engineering and design services.  (See Pl.'s Ex. 2 ¶ 19.)  In fact, Hoffman admitted

that they did not have the cash or a line of credit to pay CSA for the invoices

submitted.  (Hoffman Dep. at 77-78.)  Instead, Hoffman testified that CSA

understood that it would not be paid until a store was sold and leased back,[11] (id. at

75-81; 154), although the acceptance letter clearly states that "Retail Group S.E.

Inc. and Boxcar Foods USA Inc. hereby guarantee payment within ninety (90)

_____

[9]  Hoffman further testified that the change "wasn't the original contract and he [CSA] knew it,"  (Hoffman Dep. at 99), and that he advised CSA that it had not designed what he originally requested.  (Id. at 107-08.)  This testimony does not change the fact that Hoffman agreed to the changes to the refrigeration system.  In addition, there is no evidence of any agreement between Hoffman and CSA to provide Hoffman with additional plans containing only the air curtain concept.  Nor is there any evidence that Hoffman informed CSA of his alleged expectation that CSA would provide him the originally requested design in addition to the design with the agreed upon changes, as argued by Hoffman.

[10]  Hoffman contends that the drawings were identical.  (Hoffman Dep. at 161.)

[11]  There is no written evidence of this alleged method of payment.

10

days."  (Ex. B to Samuels Aff.)

## IV. Applicable Substantive Law and Analysis

CSA contends that Retail Group breached the contract when it failed to pay CSA for the engineering and design work it performed under the contract. (Compl. ¶¶ 14-16.)  Defendants argue that CSA is not entitled to summary judgment because the contract is ambiguous and those ambiguities must be resolved by a jury.  (Def. Br. at 12-15.)  In the alternative, defendants argue that even if the court resolves the ambiguities, CSA failed to perform as agreed under the contract.  (Id. at 15-17.)

### A.  The Contract is Not Ambiguous

Because "[a]mbiguity in a contract precludes the trial court from entering a summary judgment" under Alabama law, Whitetail Dev. Corp., 689 So.2d 865, 867 (Ala. Civ. App. 1996), the court must first examine defendants' argument that the contract was ambiguous.  See Gabrielson v. Healthcorp of Eufaula, Inc., 628 So.2d 411, 415 (Ala. 1993).   Under Alabama law, whether a contract is ambiguous is a question of law for the court.  Vainrib v. Downey, 565 So.2d 647 (Ala.Civ.App. 1990).  Alabama courts employ a three-step process in resolving claims of ambiguity.  First, if the court "determines that there is no ambiguity, it [then] must "determine the force and effect of the terms of the contract as a matter

11

of law." <u>Cherokee Farms, Inc. v. Fireman's Fund Insurance Co.</u>, 526 So.2d 871, 873 (Ala. 1988) (internal quotation marks and citation omitted).   Second, if the court determines that the contract is ambiguous, it "must employ established rules of contract construction to resolve the ambiguity." <u>Voyager Life Ins. Co. v. Whitson</u>, 703 So.2d 944, 948 (Ala. 1997).   Third, if the application of such rules is insufficient to resolve the ambiguity, factual issues arise:

> If one must go beyond the four corners of the agreement in construing an ambiguous agreement, the surrounding circumstances, including the practical construction put on the language of the agreement by the parties to the agreement, are controlling in resolving the ambiguity.

<u>Id.</u> at 949.  Where factual issues arise, the resolution of the ambiguity becomes a task for the jury. <u>McDonald v. U.S. Die Casting & Dev. Co.</u>, 585 So.2d 853 (Ala. 1991).

An ambiguity exists where contract terms are "reasonably susceptible to two or more constructions or there is reasonable doubt or confusion as to their meaning." <u>Avis Rent A Car Systems, Inc. v. Heilman</u>, 876 So. 2d 1111, 1122 (Ala. 2003) (quoting <u>Alfa Life Ins. Corp. v. Johnson</u>, 822 So.2d 400, 404 (Ala. 2001)).  However, a contract is not ambiguous simply "because the parties allege different constructions of [it]." <u>Ex parte Univ. of South Ala.</u>, 812 So.2d 341, 345 (Ala. 2001) (internal quotation marks and citation omitted).

12

Defendants contend that the following eight aspects of the contract are ambiguous: (1) although the scope of services section includes two phases, the compensation section references a third phase; (2) because the contract does not specify the number of stores to which it applies, it is unclear how long the relationship was to continue between the parties; (3) the contract is unclear as to the length of time CSA will be the program manager and for how many stores; (4) although the contract excludes all direct travel expenses and does not include them in the list of reimbursable expenses, CSA billed for travel expenses; (5) the contract refers to "stores" throughout, but the closing paragraph indicates it will develop plans for only one store; (6) there is no time frame described as to when CSA proposed to commence work and how long it anticipated the projects to take; (7) there is no indication as to whether program management would apply to all stores; and (8) there is no indication as to which stores were included within the scope of the contract.  (Def. Br. at 13-14.)  Additionally, defendants argue that the testimony of Hoffman and Trolinger, as well as the affidavit of Clive Samuels, raise further ambiguities regarding any verbal changes to the contract and create issues of material fact.  (Id. at 14-15.)

These arguments, taken individually and as a whole, fail to render the contract ambiguous as a matter of law.  The first alleged ambiguity is

unreasonable when reading the contract as a whole.  That the project was to have two phases, a design phase and a management phase, does not necessarily mean that the compensation was to occur in two phases.  In fact, the court would be surprised to find a contract where the compensation occurred exactly in the same manner that the project was described, especially in a contract for an ongoing relationship, such as this one.

The sum of four of defendants' arguments (nos. 2, 3, 6, and 7) is that the court should find the contract ambiguous because there is no definite time-frame allotted for in the contract.  This argument fails.  Reading the contract as a whole, the contract clearly envisions a working relationship – one that is virtually impossible to place within any kind of time frame.  This point is especially true because much of the work to be performed under the contract was tied to obtaining permits from local governments.  Moreover, it is clear that CSA's management duties under Phase II of the contract cease once construction has ended.  There is simply no other way to read the contract and defendants have not provided the court with any alternative understanding.

Additionally, the contract is not ambiguous regarding the number of stores (nos. 7 and 8) included.  It is clear from the compensation section of the contract that CSA will provide management services for the first six stores and then for a

14

facility in Greenville, South Carolina.  There are no further obligations under the contract.

The remainder of the listed arguments amount to nothing more than "nit picking" with various details, unimportant to the overall contract.  For instance, the referral to a single "store"[12] in the concluding paragraph of the contract (no. 5), is unmistakably a typographical error.  Additionally, a disagreement over whether travel expenses were reimbursable under the contract (no. 4) does not render the contract in this case ambiguous.  The contract clearly excludes travel expenses, and an experienced businessman, like Hoffman, would surely understand that because they are explicitly excluded, such expenses would be billed separately.[13]  None of these arguments render the contract ambiguous as a matter of law.

Finally, defendants' argument that the testimony surrounding the verbal changes to the contract raise ambiguities and create material questions of fact fails.  The testimony of Hoffman, Trolinger, and Samuels could not be any more clear:

---

[12]  The sentence refers to "look[ing] forward to working with Fairway," an entity not a party to the contract at issue.

[13]  Defendants quibble with the fact that travel expenses were not listed in the small portion of the contract which details reimbursable expenses.  That list, however, contains unremarkable items such as overnight mailing services and plotting, printing and reproductions. Tellingly, the list does not include any of the more important and more expensive items listed in the specific exclusions section in the contract.

Hoffman accepted the changes to the contract proposed by CSA.  That Hoffman testified he did so reluctantly does not raise an ambiguity.  Nor does Hoffman's testimony that he still expected CSA to provide drawings under the original contract.  As explained in more detail below, such an expectation was without merit because the modification to the contract relieved CSA of any duty to provided the plans as originally contemplated in the contract.

The court, therefore, concludes that the contract was not ambiguous. Because of this conclusion, the court proceeds with its analysis of plaintiff's claim that defendants breached the contract when they failed to pay for the services rendered.

### B.  The Contract was Breached

To establish its breach of contract claim, CSA must provide substantial evidence of the following four elements: "(1) the existence of a valid contract binding the parties in the action, (2) [it's] own performance under the contract, (3) the defendant's nonperformance, and (4) damages."  Hooper v. Columbus Reg'l Healthcare Sys., Inc., 956 So.2d 1135, 1139 (Ala. 2006) (quoting Jones v. Alfa Mut. Ins. Co., 875 So.2d 1189, 1195 (Ala. 2003)) (internal quotation marks omitted).  Of the four elements, three are undisputed: a valid contract existed between the parties; Retail Group failed to pay for the work performed by CSA;

16

and CSA has incurred actual damage, in that it has not been paid for the services provided.  Defendants dispute the second element, however, and argue that CSA failed to perform as agreed under the contract.

Defendants contend that CSA failed to perform because, although Hoffman agreed to the utilization of the conventional refrigeration system with doors, "[a]t no point did he advise anyone that he did not want to receive the originally requested design." (Def. Br. at 16.)  This argument fails.  When Hoffman agreed to the use of doors on certain refrigerated areas,[14] the contract between the parties was modified.  See generally Ex parte Amoco Fabrics and Fiber Co., 729 So.2d 336, 340 (Ala. 1998) (citation omitted).  Upon Hoffman's agreement to this change, the original contract failed to exist in its original form, and CSA was under no obligation to provide defendants with the plans containing only the air curtain system.  See 17 Am. Jur. 2d Contracts § 507 (2007) ("A 'modification of a contract' is a change in one or more respects, which introduces new elements into the details of the contract and cancels others but leaves the general purpose and effect undisturbed.")  Any conclusion to the contrary is untenable.  As such, CSA is entitled to summary judgment on its claim for breach of contract.

_____

[14] That Hoffman's agreement to this change was reluctant or forced because of time constraints is of no moment.  It is undisputed that Hoffman agreed to the changes and communicated his approval of this modification to CSA.

17

## C.  *Hoffman is Personally Liable for the debts of Retail Group*

CSA alleges that Hoffman misused the corporate form of Retail Group and Boxcar as a means of defrauding CSA.  (Compl. ¶¶ 17-23.)  As such, CSA contends that the court should pierce the corporate veil and hold Hoffman personally liable for the debts of Retail Group.  Defendants argue that this decision should rest with a jury, and not the court.

Alabama law has long recognized that in proper situations, when the corporate form is being used to evade personal responsibility, the corporate form will be disregarded and liability will be imposed on the person controlling the corporation and subverting it to his personal use by the conduct of its business in a manner to make it merely his instrumentality.  See Cohen v. Williams, 318 So.2d 279 (Ala. 1975).  "A separate corporate existence will not be recognized when a corporation is so organized and controlled and its business so conducted as to make it a mere instrumentality of another or the alter ego of the person owning and controlling it."  Co-Ex Plastics, Inc. v. AlaPak, Inc., 536 So.2d 37, 38 (Ala. 1988); see also Culp v. Econ. Mobile Homes, Inc., 895 So.2d 857, 859 (Ala.2004) That being said, the court is mindful that "piercing the corporate veil is not a power that is lightly exercised."  First Health, Inc. v. Blanton, 585 So.2d 1331, 1334 (Ala. 1991).

18

To prevail on this claim, CSA must show that the corporate form was used as a mere instrumentality to evade personal responsibility. See, e.g., Messick v. Moring, 514 So. 2d 892, 894 (Ala. 1987).  More specifically, Alabama courts require the following showing for imposition of personal liability:

> 1) The dominant party must have complete control and domination of the subservient corporation's finances, policy and business practices so that at the time of the attacked transaction the subservient corporation had no separate mind, will, or existence of its own;
> 2) The control must have been misused by the dominant party. Although fraud or the violation of a statutory or other positive legal duty is misuse of control, when it is necessary to prevent injustice or inequitable circumstances, misuse of control will be presumed;
> 3) The misuse of this control must proximately cause the harm or unjust loss complained of.

Id. at 894-95.  "The mere fact that a party owns a majority or all of the corporation's stock does not, of itself, destroy the corporate identity, but it is a factor to be considered in determining the control of the corporation."  Id. at 895. Given the fact-intensive nature of the veil-piercing analysis, the determination is typically one to be resolved at trial, where the trier of fact can make choices as to credibility and weight of the evidence.  See Perry v. Household Retail Servs., Inc., 953 F.Supp. 1378, 1381 (M.D. Ala. 1996) (citations omitted).  However, in light of Rule 56, the court may grant summary judgment if a court determines, under the appropriate standards, but one result could be reached.  Id.

19

Viewing the facts in the light most favorable to Hoffman, only one conclusion could be reached: the corporate form should be disregarded and personal liability imposed upon Hoffman.  The undisputed evidence reveals that Hoffman has complete control over Retail Group.  Not only is he the CEO, CFO, and sole stockholder, but Hoffman's deposition testimony highlights the extent to which Retail Group was nothing but a shell of a corporation.  For instance, Hoffman could not identify any other officer of Retail Group other than himself and Aaron Arrandondo as directors of Retail Group, stating that he would "have to check it and . . . come back to you."  (Hoffman Dep. at 19.)  As there is no evidence in the record of any other directors, (see Def. Ex. 6), the court assumes that no others exist.  When asked what Arrandondo does, Hoffman testified that he was a "research analyst" whose duties were limited to studying the retail market and helping develop the Boxcar concept.  (Hoffman Dep. at 33.)  Hoffman did not list any responsibilities normally associated with an officer of a corporation.

In addition, although the court dismissed Boxcar Foods USA, Inc. as a party to this action because it does not exist, the court cannot ignore the fact that Hoffman contracted in the name of a corporation that did not exist.  That he now alleges that the corporate name he used twice in his acceptance letter was a mistake is of no moment.  Even taking this allegation as true, and substituting the

20

entity Boxcar Foods, Inc. as the contracting party, the court still concludes that Boxcar Foods, Inc. was no different from Retail Group: they were both a shell of a corporation.  Defendants have presented no evidence to refute this conclusion and the admission by Hoffman regarding Boxcar Foods USA, Inc. further reflects his complete disregard for the corporate form.

Finally, The undisputed evidence makes it abundantly clear that Hoffman used the corporate form as a subterfuge to obtain services from CSA.  See Backus v. Watson, 619 So.2d 1342, 1345 (Ala. 1995) (citation omitted).  Hoffman's acceptance letter, written on Retail Group letterhead, "guarantees" payment to CSA from Retail Group and the non-existent Boxcar Foods USA, Inc.  CSA relied on this guarantee and performed the services under the contract.  Despite the guarantee, Hoffman admitted in his deposition that neither corporation had the resources available to pay for the services rendered by CSA.  (Hoffman Dep. at 77-78.)  The court, therefore, concludes that Hoffman abused the corporate form and CSA is entitled to pierce the corporate veil and hold Hoffman personally liable for the debt owed to it.  No reasonable juror could conclude otherwise.[15]

---

[15]  Hoffman's argument regarding the lack of due diligence performed by CSA misses the mark.  Although one method of piercing the corporate veil is to establish that a corporation is undercapitalized, see First Health, Inc. 585 So.2d at 1334, CSA did not choose this alternative.  Instead, it argued that the corporation was operated as the alter ego of Hoffman.  Id.

## V.  Conclusion

In summary, the court finds that no material issues of fact remain and that plaintiff CSA is entitled to judgment as a matter of law as to all claims asserted against defendants Retail Group SE, Inc. and Jerome Hoffman, jointly and severally.  A separate judgment, in the amount of $549,203.20 will be entered against defendants, jointly and severally.

**DONE** this the __1st__ day of February, 2008.

_____

SENIOR UNITED STATES DISTRICT JUDGE